### 5917.   RICE *v.* THE STATE.

1. To warrant a conviction based on the testimony of an accomplice, the corroborating evidence must, independently of his testimony, connect the defendant with the. commission of the offense, and tend to show his guilt. *Milner* v. *State,* 7 *Ga. App.* 82 (66 S. E. 280); *Smith* v. *State,* 7 *Ga. App.* 781 (68 S. E. 335); *Bishop* v. *State,* 9 *Ga. App.* 205 (70 S. E. 976).

2. In cases of alleged arson, where nothing appears but the burning, the law presumes that the fire was the result of accident or providential cause, and the burden of proof is on the prosecution to overcome this legal presumption. *Ragland* v. *State,* 2 *Ga. App.* 492 (58 S. E. 689); *West* v. *State,* 6 *Ga. App.* 105 (64 S. E. 130); *Burley* v. *State,* 6 *Ga. App.* 776 (65 S. E. 816); *Williams* v. *State,* 125 *Ga.* 741 (54 S. E. 661).

3. "In a trial for arson the allegation of title or occupancy need not be proved with the same degree of fullness that would be necessary in actions involving title or the right of possession." *Morgan* v. *State,* 120 *Ga.* 499, 502 (48 S. E. 238). The offense of arson is not so much against the property interest in the building as it is against the security of the building, "and an allegation of ownership in an indictment is sustained by proof of occupancy by the alleged owner under a claim of right." *Harrell* v. *State,* 121 *Ga.* 607 (49 S. E. 703).

4. The sufficiency of circumstances proved to corroborate the accomplice is entirely a matter for the jury (*Dixon* v. *State,* 7 *Ga. App.* 604, 67 S. E. 699), provided the circumstances proved, independently of the testimony of the accomplice, lead to the inference that the defendant is guilty, and in some way connect him with the guilty act. *Smith* v. *State,* 7 *Ga. App.* 781 (68 S. E. 335).

5. It is not essential that the testimony in corroboration of an accomplice shall of itself be sufficient to warrant a verdict of guilty, or that the testimony of the accomplice shall be corroborated in every material point; but it is necessary, in addition to. the corroboration of the ac-

complice, that the testimony shall be of itself sufficient to raise an inference that the defendant is guilty. *Bishop* v. *State,* 9 *Ga. App.* 205 (70 S. E. 976).

6. The court, in charging the jury on the law as to reasonable doubt, need not explain the meaning of the term "reasonable doubt." *Barker* v. *State,* 1 *Ga. App.* 286, 288 (57 S. E. 989); *James* v. *State,* 1 *Ga. App.* 779, 780 (57 S. E. 959). "It is very seldom that an amplified definition of the term 'reasonable doubt' elucidates the meaning of these simple words." *Middleton* v. *State,* 7 *Ga. App.* 1 (2) (66 S. E. 22). "A general charge that the jury must be convinced of the guilt of the accused 'beyond a reasonable doubt' would be sufficient (*Norman* v. *State,* 10 *Ga. App.* 802, 74 S. E. 428); but amplification which could not mislead the jury or confuse their minds as to the plain meaning of these words is not reversible error." *Layton* v. *State,* 15 *Ga. App.* 416 (83 S. E. 431, 433).

7. It was not incumbent upon the judge to instruct the jury as to precisely what corroborating circumstances would be required by law to prove the guilt of the defendant; it is preferable that he should not summarize the evidence. The charge on this subject was fair and sufficiently full.

8. There was no error in the admission of testimony; the charge of the court as a whole was free from error, and there is no substantial merit in the various exceptions to extracts from the charge. The instructions requested were sufficiently covered by the charge; and the evidence authorized the verdict.

· DECIDED MARCH 18, 1915.

Indictment for arson; from Macon superior court—Judge Littlejohn. July 11, 1914.

Jim Rice was convicted under an indictment charging him with wilfully and maliciously setting fire to and burning "a certain wooden framed building, the same being a barn and storage house, the property of Ed. M. McKenzie," etc. He excepted to the refusal to grant his motion for a new trial. The evidence discloses that on February 2, 1914, a barn, where live stock was housed and foodstuffs stored, was destroyed by fire. The barn was in the possession of Ed. M. McKenzie, who held a bond for title to the property from the Penn Mutual Life Insurance Company, the legal title being vested in that company as security for a loan to McKenzie. Henry McDonald was the foreman who had charge for McKenzie of the place on which the barn was situated, and on Sunday night, February 1, 1914, about half-past eleven o'clock, he went to the barn before going to bed, and found nothing wrong. Between twelve and one o'clock he awoke and discovered that the barn was on fire, and after giving the alarm he got the mules out from the burning structure, and ran out a sow that slept there. There was

no fire in the lower part of the barn when McDonald reached it, but the blaze and roaring were above. There was no storm nor any lightning that night, and there was no smoking around the barn during the day before. All of McDonald's family but himself were at church that day. Albert Robinson testified, that he had known the defendant about twelve years, and on the Sunday night when McKenzie's barn was destroyed by fire he accompanied a girl from church, after the services were over, to her home, about three miles away, and after leaving her he returned to his home, coming back to the McKenzie barn and by the house of Henry McDonald, which was not far from the barn; that on his way home he saw Jim Rice coming down the road a long distance ahead of him, observed his peculiar walk, and finally approached within twenty-five or thirty yards of him, and plainly recognized him, not only from his appearance but on account of the clothing he had on, which was the same clothing Rice had worn that day at the church; that the moon was shining brightly, and he knew it was the defendant he saw in the road, because he had known him for about twelve years. "I recognized him that night because I know him, he has a little twisted walk. When he walks he kind of walks like a woman. I could see that twitch in his walk as far as from here across the street. The moon was full, and it was setting in the west at that time of the night." "When I first saw him I was at Uncle Henry's house [referring to the house of McDonald], and he was going into the lot gate [referring to the lot adjacent to the barn that was burned]. I recognized him as being Jim Rice, and I tell the jury it was him." This witness testified that after seeing Rice go into the lot gate, near McDonald's house, he (the witness) went on to his own home about a quarter of a mile away and went to bed about twelve o'clock, and very soon thereafter he distinctly heard a noise down at Henry McDonald's and heard people coming down the road talking about the fire.

McKenzie testified, that he had had certain troubles with the defendant, and about a week prior to the burning of the barn had said to him: "I have been trying to be a neighbor to you, but I am getting tired of the way you are acting, and I tell you if I ever do have any proof to convict you of your devilment, then I don't want you to ask me to have any mercy on you." He testified further that there was trouble between the defendant and himself

because he had castrated a boar shoat belonging to Rice, which frequently came to his lot, and which was on that day found in his pen with some fine Berkshire and Jersey hogs. There was evidence from O. H. Levie and Oscar McKenzie that on Sunday before the burning of McKenzie's barn, the defendant had applied for and obtained from them respectively $50 and $15, which he paid back on the following Monday morning. Scott Towns testified, that he lived on Ed McKenzie's place, and had known Jim Rice for about three or four years; that the barn described in the indictment was burned on Sunday night about twelve o'clock; that on Friday before the burning, Rice came to his house and inquired if he wanted to make some money, and, in response to his inquiry as to how the money was to be made, Rice replied that Mr. McKenzie had not been treating him right and was "running over him;" that Mr. McKenzie had cut his hog and promised to give him another, but had not done so, and "he lied." The witness said that the defendant finally told him that night that if the witness would set the barn on fire he would give him $50, or if the witness would go there and watch for the defendant while he applied the fire, he would give him $50; that he said further that he had the money, as he had borrowed some from Mr. Oscar McKenzie, and what was lacking he would borrow on Monday and pay the witness; that on Sunday at Piney Grove Church, about eight o'clock at night, Rice drove to the church and called the witness off to one side; that Rice was "dramming"—he was drinking, and gave the witness a drink, and said, "Come on, let's do that;" and when the witness replied that he was going to remain at the church until after meeting, but would be on directly, and suggested that if they set fire to the barn the fact would be discovered, Rice replied, "You ain't obliged to tell, and I will pay you all right up;" that Rice got in his buggy and went towards the barn that was afterwards burned, and the witness went into the church and staid there until they began taking up a collection, and then went home and waited for Rice; that in about twenty-five or thirty minutes Rice came by in his buggy and told him that as soon as he tied his mule he would be back; that Rice came back soon after and reported that he had tied his mule, and then went across the cotton-patch and over into the lot surrounding the barn. The witness did not get over the fence, but Rice went around by the fence and jumped it and went around to a shed and

opened it, "and came in and along the passage where there is a stairway up, where you can go up, and he set it afire there," and left without paying the witness anything, and in three or four minutes the fire developed; that at the time the witness reached the corner of the fence and Rice went around the lot, the witness saw some one in the road, but did not know who it was, and thought whoever it was might have recognized the accused; that Rice then crossed the corner of the cotton-patch, in the direction of his home, and he did not see Rice again until the next day, though other people began coming to the fire about one o'clock that night, when the alarm commenced. The evidence showed that dogs followed the track of Towns away from the burning barn to his house, but it does not appear that there was any effort to find Rice's track across the field. After Towns was told that the dogs had tracked him, he stated that Rice had burned the barn, and that he watched for Rice.

*Hatcher & Smith, John B. Guerry*, for plaintiff in error.

*J. R. Williams, solicitor-general,* contra.

WADE, J. (After stating the foregoing facts.) The evidence of Scott Towns, the alleged accomplice of the defendant, established the commission of the crime and directly implicated the defendant therein. Independently, however, of the evidence of the accomplice, there was testimony sufficient to authorize the inference that the barn was feloniously burned, and to directly connect the defendant with the burning. It was shown by testimony, other than that of the accomplice, that the accused, who lived not far distant from the barn, cherished a grudge against the owner thereof; that on the night of the burning, shortly before twelve o'clock, the foreman on the place where the barn was located, who lived not far from the barn, visited and inspected it, and found everything safe and discovered no fire; that there had been no fire and no smoking about the barn during that day, and no other person than the foreman had been there during the entire afternoon before the fire; that perhaps within a half hour after the foreman had inspected the premises, fire broke out in the barn; that in the interval of time between the inspection by the foreman and the discovery of fire another witness saw the defendant go into the lot surrounding this barn, and plainly recognized him in the bright moonlight; that this witness went directly to his home, only a quarter of a mile dis-

tant, and immediately went to bed, and a very few minutes thereafter heard the alarm of fire, and discovered that the barn was blazing; that the barn was full of forage and other inflammable material upstairs, and the fire broke out there, where neither the foreman nor any one else had recent occasion to go; and that there was no storm or lightning during the night, but the elements were calm and the skies clear.

In the case of *Johnson* v. *State,* 89 *Ga.* 107 (14 S. E. 889), the statement of facts discloses that there was "testimony tending to prove his [the defendant's] presence on the premises of his father-in-law, where the burned barn and stockade were situated, on the night of the burning and shortly before the fire was discovered, together with testimony showing that the defendant and his wife had a 'falling out' and separated on the day preceding the burning, she going to her father's plantation with the father's consent, and the defendant cursing and saying, she might move but it would do her no good, because he was going to make their damned hearts ache them before many nights and days, and that he was 'going to kick up much hell in Dougherty.'" There was also testimony for the State in that case to the effect that it was impossible for the burning to have been accidental. On this evidence the judgment refusing a new trial was affirmed by the Supreme Court. In *Morgan* v. *State,* 120 *Ga.* 499, 500 (48 S. E. 238), the court said: "There was evidence to show that the fire could not have originated from accidental causes; that no fire was left in the place where the conflagration began, and that the room had been left securely fastened, with no fire therein when the occupants departed at night." There too the conviction was sustained. It was urged in that case that there was no proof of the corpus delicti, and the conviction depended exclusively and wholly upon a confession uncorroborated by anything showing that the arson had been committed, or that the burning was wilful and malicious. The testimony further showed that the defendant had borrowed some oil about midnight on the night of the fire, and that he was seen coming from towards the storehouse where the blaze had begun to appear. In his statement he claimed to have been at home in the country at the time the fire must have originated, and to have come to the fire after he saw the conflagration. Justice Lamar (now of the United-States Supreme Court), speaking for the court, said: "He may have

been drunk, as he claimed; but his borrowing the oil, his presence at the fire about the time it was discovered, the qualified threat of the day before, the absence of an explanation of his presence at such an unusual hour and place, were circumstances sufficient to corroborate the confession that he set fire to the building described in the indictment and otherwise shown not to have been accidentally burned." In this case the defendant in his statement contented himself with denying that he had seen the alleged accomplice on the day fixed by the testimony of the latter, or had had any conversation with him at any time with reference to burning the barn, but, strange to say, there is not in his entire statement a distinct assertion that he did not in fact commit the crime with which he was charged! Nor does it appear therein that he denied his presence at the barn at the time when the testimony of the witness other than the alleged accomplice placed him there, nor did he admit and seek to explain his presence, though his presence there away from his own home, at that hour of the night, where he could scarcely have had any legitimate, ordinary reason to urge for such presence, demanded an explanation. In the face of this damning testimony he appeared to think it was more necessary for him to convince the jury that he never had trouble with white people, but always looked to them for help and always tried "to stay in a negro's place," than to convince them of his innocence of the charge against him.

There was evidence tending to show that the fire could not have been of accidental origin, since there had been no fire or smoking near the barn during the day prior to its destruction or up to the period of time only a few minutes before the flames appeared; the accused was seen at the barn during the interval between the last inspection and the discovery of the fire, and within a negligible time thereafter the flames burst forth; he offered no explanation for his unusual and apparently unnecessary presence after midnight at a time and place where he had no known reason to be, nor did he deny at his trial that he was in fact there; several personal clashes, with no inconsiderable friction, between himself and the owner of the barn were shown to have occurred within a short time prior to the burning. All this was proved by witnesses other than the accomplice, and the jury were authorized to infer from this testimony alone that the fire was of incendiary origin and that the defendant

was connected therewith; and when this is coupled with the testimony of the accomplice, and with other testimony corroborating the statement of the accomplice on certain minor points, there was enough to convince the jury of the guilt of the defendant beyond a reasonable doubt, if they believed the testimony.

The headnotes cover sufficiently the various points raised in the special grounds of the motion for a new trial.

<em>Judgment affirmed. Broyles, J., not presiding.</em>