*M. C. Barwick,* contra.

---

## 6287.  JORDAN *v.* THE STATE.

1. The evidence authorized the instruction given to the jury as to the law of voluntary manslaughter.
2. There is no merit in the special assignment of error that the court erred in charging as to provocation by words, threats, menaces, or contemptuous gestures, without sufficient explanation that the fears of a reasonable man might be aroused thereby; for neither the testimony nor the statement of the accused suggests or intimates that any words, threats, menaces, or contemptuous gestures were used at the time of the homicide or at any other time by the deceased towards the defendant.  There is no reversible error where no injury could have resulted to the accused.
3. The evidence and the statement of the accused authorized the verdict of voluntary manslaughter.

DECIDED JUNE 3, 1915.

Indictment for murder—conviction of manslaughter; from Laurens superior court—Judge Larsen.  December 5, 1914.

*R. Earl Camp,* for plaintiff in error.

*E. L. Stephens, solicitor-general,* contra.

WADE, J.  Will Jordan was tried under an indictment for murder and was found guilty of voluntary manslaughter; his motion for a new trial was overruled, and he brought the case to this court for review.  The brief of evidence discloses that one Luvenia Johns was the only witness who testified to having seen the fatal encounter between the defendant and the deceased; and her statement, that she herself, Lewis West (the deceased), Will Jordan (the accused), and the wife of the accused, were the only persons present at the time of the tragedy, is uncontradicted, except that the defendant, in his statement at the trial, denied her presence at the precise time the homicide occurred.  According to the testimony of Luvenia Johns, West, at the time of the shooting, was standing on the back porch of her house, with one foot on the ground and with one on the steps, Will Jordan was standing "on the porch in the hallway," and Jordan's wife was standing behind Jordan; West had been at the house about half an hour or more, but had not been in the house; Jordan said nothing to West when

he shot, nor did West say anything to Jordan; the witness was standing there talking when Jordan came in the house, and Jordan's wife said he was drunk; Jordan heard his wife say that he was drunk; the witness turned around and caught Jordan in the collar, and said, "You must not come in here drunk;" whereupon Jordan turned around and commenced shooting; it appeared to the witness that he shot three times; she was holding or tried to hold Jordan, as she thought he was drunk, and he shot across her shoulders at West, who was standing behind her, "sorter down on the ground;" Jordan "snatched aloose" as soon as he finished shooting, and went back in the house, and the witness never saw him afterwards until the day of the trial in 1914. The shooting occurred in 1907. She further testified, that the deceased had been painting at her house and was not yet through, as he was painting the inside and putting up wall-paper; that he would have been back before the day he was killed, to finish the painting, but she "had to move out of the room to give him time, and he came back to see about it, and that's the reason he was at my house;" that she did not hear the deceased say a word after he was shot, but when he was shot she heard a slight noise, and turned around and saw him fall backwards, and at that time Jordan ran "around her house, and she never saw him again;" that Jordan lived just above her place, on the same street, with a vacant lot belonging to her between his house and hers, and that Jordan's wife had been at her house all the morning, since just before 9 o'clock, and West came there about 3 or 4 o'clock in the afternoon, and had been there about half an hour before the shooting took place; that West lived back of the witness's place about 100 or 150 yards, and did not come to her house except when he was working there, and that he had not been there at work in two weeks; that she "did not see any cause in the world for Will Jordan to shoot; he just shot him off-hand;" that when Jordan came to her house and his wife said he was drunk, he "acted like he was falling, and she said 'Will, you are drunk and just can walk;' she had hold of him at that time and he was pushing and shoving her; they were pushing and shoving one another and I grabbed him;" that up to the time that West was shot he had not spoken a word to Jordan's wife, and the witness did not know whether the deceased was aware that Jordan's wife was even in the house or not, as Jordan's wife was in the

kitchen, cooking preserves. This testimony would perhaps tend to support a verdict for murder.

There was testimony as to the nature of the wounds, which showed that one bullet entered the body of the deceased from the front and one from the back; and there was also testimony that the death of the deceased was caused by the bullet wounds inflicted by the accused. The testimony further showed that the defendant left the county and disappeared, that he was arrested in another part of the State three or four years later, and while he was returning in the custody of the officer to the county of the alleged crime he threw himself out of the window of a moving train and escaped, and he was not again arrested until some years later; and that his wife disappeared about the time he did, and was not seen in the county until his trial. There was evidence as to the good character of the accused, and there was also evidence to the effect that he had on more than one occasion and by different persons sent messages to the deceased that he objected to visits of the deceased to his wife at his house, and that the deceased nevertheless was seen on several occasions thereafter at the house when the accused was absent and when no one was at home but his wife; but there was no evidence that she and the deceased had ever been seen in any improper or compromising situation, or in fact that she had ever been guilty of immoral or improper conduct with any one. There was also evidence that the deceased was not the only man who visited the house of the accused.

The defendant's statement at the trial (omitting only his tribute to himself as a law-abiding citizen of industrious habits, and his statement that he had told the deceased to stay away from his house, and a further statement that a deceased wife of the man whose present wife, Luvenia Johns, testified for the State, had accused West of being his wife's "sweetheart," and was the first one to arouse his suspicion) was as follows: "I had gone to my house that day, when this occurrence happened, and I had gone there for the purpose of having my potatoes bedded or banked. I asked the old gentleman that pulled them up the day before to come and pull them up that day, and I had gone home and gone to my door to open it, and both doors were fastened; so I goes to Mary Gallemore's, next door to my house, and asked her could she tell me where my wife was, and she said, 'Yes,' she was down to

Mrs. Johns'; and so I goes down there and walks to the door, and I felt that there was something wrong, after not finding her at home, and I didn't knock on the door; I opened the door and entered in, and when I entered the room door I saw something drop down near in the corner with the scarf that covered the lounge, and I walked there and snatched it up, and it was my wife, and I said, 'What are you hid for?' and about this time this woman [the Johns woman] came running in from the kitchen (her kitchen is on a little veranda that extends to the kitchen), and she ran in and they grabbed me, both of them, one on each side of me, and she said she had my wife cook fig preserves; and I said, 'What are you trying to scrumble with me?' I said, 'She aint cooking no fig preserves in here,' and she said, 'Come back and see'; and I heard some scrumbling behind me, and this fellow Lewis West was coming out of the door. They had got me out of the room door and was making towards me, and he had a fine chance to get out of the front door. I left the door open when I came in the house, and I saw that they had me devoured, and he came right on to me and didn't turn until I shot him twice. I don't know whether I hit all the times or not, but he still kept on and run over me and the womens both. Mrs. Johns, she claims she was in there, but she was not in there. That man was in the room and I heard scrumbling, and as I entered the door she just got up in time to throw the scarf over her head, and when I did this shooting, the first shot I had to make, I had to do it to make these women turn me aloose to keep this man from killing me; he had plenty of chance to get out, the front door was in four or five feet, and they had me, trying to carry me to the kitchen, the kitchen was on the outside at the back veranda."

It will be observed, from an examination of the statement of the accused, that he nowhere charges that he discovered his wife and the deceased either in the act of adultery or about to engage in the commission of that crime; nor does he himself assert that they were even in a compromising position at the time when he entered the house of the Johns woman and discovered their presence. It will also be noted that from his own statement it does not appear that at the time he shot West, the latter was attempting to commit a felony upon his person, or was even armed with a deadly weapon, but it appears that West was endeavoring to leave the premises,

though he says West was "making towards me." Some of the testimony discloses that the best and shortest way for the deceased to leave the house from the room where the statement of the accused placed him was through the front door, and the accused himself said: "West was coming out of the door [presumably the door of the room where he claimed to have discovered him]. They had got me out of the room door [in the hall] and was making towards me, and he had a fine chance to get out of the front door. I left the door open when I came in the house, and I saw that they [his wife and the Johns woman] had me devoured, and he came right on to me and didn't turn until I shot him twice. I don't know whether I hit all the times or not, but he still kept on and run over me and the womens both." There is no hint or suggestion that West made any threats, menaces, or contemptuous gestures, or that he approached the accused with any weapon, or even with the apparent purpose and intention of committing an assault less than a felony upon him, nor is there any specific claim on the part of the accused that he was acting under the fears of a reasonable man at the time he fired the two shots into the body of the deceased, notwithstanding his assertion, "I had to do it to make those women turn me aloose to keep this man from killing me;" but, according to his own statement, it would seem that West was seeking to escape from the room where the accused says he discovered him, by going down the hall and out of the front door, which the accused said was wide open and offered an apparent means of exit. Under the statement made by the accused himself, in connection with all the evidence in the case, his conduct at the time of the homicide can be explained only on the natural assumption (conceding the truth of his own statement that he seriously objected to the attentions he believed West had been paying to his wife) that when he reached his home on the day of the tragedy and was told by the Gallemore woman that his wife was at the house of Luvenia Johns, and, on going there, discovered her (as he says) in the same room with his real or imagined rival West, when he was himself partially intoxicated, he became inflamed with rage and carried away by fury provoked by his finding West in the presence of his wife, notwithstanding his positive prohibition; that when West approached him (with bare hands, so far as the evidence shows), either with the purpose of making an assault upon him less than a felony, or intending to pass

by him and out of the front door, he was carried away by irresistible passion and fired the fatal shots.

Granting that the accused was intensely jealous, and granting that he had cause to suspect the fidelity of his wife, it is easy to understand how he could have been carried away by an irresistible tide of passion, especially if he was inflamed with alcohol, when he discovered his wife with West, even though nothing actually improper appeared to be then in progress or about to occur. Of course, if he had, after witnessing the act, shot in a spirit of revenge, he would have been guilty of murder; but, under the circumstances detailed by him, it was possible for the jury to conclude that there was no admixture of deliberation in the homicide, but that it was brought about by causes which, though insufficient to justify him, would warrant a verdict of manslaughter rather than of murder, upon the idea that the killing was the result of sudden and uncontrollable passion. We think therefore that the evidence warranted a charge as to the law of manslaughter.

The accused excepts, in his motion for a new trial, to the charge of the court that "provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder" (Penal Code, § 65). He contends that this charge, without further explanation, tended to confuse the jury, and also that the court should have explained, in connection therewith, that words, threats, menaces, or contemptuous gestures might under some circumstances be sufficient to arouse a reasonable fear in the mind of the slayer, and thereby afford a complete justification for the killing. It is well settled by repeated adjudications that where an alleged error can not result in injury to the party complaining, it will not afford a sufficient ground for reversal. "Error must be accompanied by injury." *Jackson* v. *State*, ante, 213 (84 S. E. 974), and numerous other cases. From what has been said already, and from an examination of the statement of the accused himself, it will be seen that it was not stated or even suggested that the deceased made any threats, menaces, or contemptuous gestures directed towards the accused, nor does it, even from the statement of the defendant, appear that the deceased uttered a word from the time the accused encountered him, either in front of the house of the Johns woman (as she testified), or in a room of that house, as the defendant

alleged in his statement to the jury. This instruction must, there-
fore, be treated as mere surplusage, which could not have affected
the rights of the accused. Nor can it be said that the court, in
giving these words in charge to the jury, withdrew from their
consideration the real defense which the accused sought to set
up, to wit, that the deceased at the time was either engaged in
or about to engage in adulterous intercourse with the wife of the
accused. The court charged the jury that if they believed "that
the defendant came upon his wife and the deceased at a time
when they were preparing to commit an act of adultery, or to have
sexual intercourse, or under such circumstances as to evidence to
a reasonable man that such act was intended or about to be com-
mitted, and that the defendant shot the deceased to prevent such
adulterous act or intercourse, he would be justified in said act of
shooting; but if, on the other hand, the jury do not believe the
killing was done to prevent the deceased from attempting or con-
summating the impending adultery or intercourse, but was done
in a spirit of revenge, to revenge a past adultery or intercourse,
such an act would not be justified in the eyes of the law." The
court further charged them that if they believed "the defendant
came upon his wife and the deceased together in such a position as
to indicate with reasonable certainty to a rational mind that they
had just committed an adulterous act of intercourse, and he then
fired this fatal shot, he would not be justified, but the shooting,
under such circumstances, would justify the jury in finding the de-
fendant guilty of manslaughter," if he acted immediately after the
crime had been committed, promptly and in the burst of passionate
indignation which overwhelmed him upon discovering the outrage
which had been done him. It appears to us that in this excerpt
from the charge, and in the charge as a whole, the defense set up
by the accused was placed before the jury in such a manner as to
leave him no ground for complaint on this score.

There is no other special assignment of error, and, in the absence
of a proper assignment of error thereon, we can not consider the
excerpt from the charge of the court which is complained of in the
brief of counsel for the plaintiff in error as being insufficient to
properly instruct the jury on one of the main contentions of the
defense. For the same reason we are not required to consider the
contention, argued in the brief of counsel for the plaintiff in error,

that the court erred in failing to define a "felony," or to define a "reasonable doubt." It may be said in passing, however, that it has been time and again held by this court, that the court need not attempt to define reasonable doubt. *Barker* v. *State,* 1 *Ga. App.* 286-288 (57 S. E. 989) ; *James* v. *State,* 1 *Ga. App.* 779-780 (57 S. E. 959) ; *Middleton* v. *State,* 7 *Ga. App.* 1 (66 S. E. 22) ; *Norman* v. *State,* 10 *Ga. App.* 802 (74 S. E. 428) ; *Rice* v. *State,* 16 *Ga. App.* 128 (84 S. E. 609). And while the Supreme Court, in *Roberts* v. *State,* 114 *Ga.* 450 (40 S. E. 297), said that "in all cases where the term 'felony,' or other technical term of the law, is contained in a section of the code which is given in charge, the meaning of such term should be explained to the jury," that expression was a mere obiter, since the court expressly said it was not necessary to determine in that case whether the failure to explain the meaning of the term "felony," in the absence of an appropriate written request so to do, would be such error as would require the granting of a new trial. It is true, that in *Holland* v. *State,* 3 *Ga. App.* 465-469 (60 S. E. 205), Judge Powell, speaking for this court, said that "in charging section 70 of the Penal Code, the judge should explain to the jury the meaning of the technical word 'felony,' used therein," and cited the *Roberts* case as authority for the statement. However, the definite rulings of the Supreme Court constitute the controlling authority in this State, and it was distinctly held in *Pickens* v. *State,* 132 *Ga.* 46 (63 S. E. 783), that "The failure of the court to give in charge the legal definition of the term 'felony' appearing in Penal Code, § 70, which section was given in charge, was not such error as requires a new trial." Again, in *Pressley* v. *State,* 132 *Ga.* 64 (63 S. E. 784), it was held, that, "in charging section 70 of the Penal Code, failure to explain to the jury the meaning of the word 'felony,' used therein, is not cause for a new trial, in the absence of an appropriate and timely request so to do." See also *Hall* v. *State,* 133 *Ga.* 177 (8) (65 S. E. 400) ; *Helms* v. *State,* 138 *Ga.* 826 (76 S. E. 323) ; *Faison* v. *State,* 13 *Ga. App.* 180 (79 S. E. 39) ; *Carver* v. *State,* 14 *Ga. App.* 267 (80 S. E. 508) ; *Franklin* v. *State,* 15 *Ga. App.* 350 (83 S. E. 196). And see *Pye* v. *Pye,* 133 *Ga.* 246 (65 S. E. 424), in which it was held that the judge did not err in failing to explain to the jury the words "fraud" and "undue influence," as used by him in his charge, where there was no proper request for such explanation.        *Judgment affirmed.*